**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 10a0363n.06

**Case No. 06-6392**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
**Jun 11, 2010**
LEONARD GREEN, Clerk

| | | |
|---|---|---|
| **BILLY EUGENE GLODJO,** | ) | |
| | ) | |
| **Petitioner-Appellant,** | ) | **ON APPEAL FROM THE** |
| | ) | **UNITED STATES DISTRICT** |
| **v.** | ) | **COURT FOR THE WESTERN** |
| | ) | **DISTRICT OF KENTUCKY** |
| **PATTI WEBB, Warden,** | ) | |
| | ) | |
| **Respondent-Appellee.** | ) | |
| _____ | ) | |

**Before: BATCHELDER, Chief Circuit Judge; SUTTON and KETHLEDGE, Circuit Judges.**

**ALICE M. BATCHELDER, Chief Judge.** A Kentucky prisoner appeals the district court's denial of his petition for a writ of habeas corpus on grounds of ineffective assistance of trial counsel. We affirm.

**I.**

Billy Glodjo and Cheryl Cherry met in 1990, began dating, and eventually began living together in a residence on Spruce Lane in Warren County, Kentucky. But by October 1994 they were no longer living together. Glodjo was in alcohol rehabilitation and had moved out because Cherry was still drinking. Cherry continued to live at the Spruce Lane residence, along with a tenant, an elderly man named Kenneth Chilson.

On the evening of October 25, 1994, Glodjo arrived at the Spruce Lane residence to meet Cherry, who was intoxicated when he arrived. Much of what happened next is disputed, but it is not disputed that Glodjo struck Cherry with his car, causing massive internal injuries. She was taken

to the hospital by ambulance and died the following day. The State of Kentucky charged Glodjo with murder, but Glodjo defended that it had been an accident. The case was tried to a jury.

The State theorized that there had been an argument in which Glodjo had ripped the telephone from the wall, ransacked the residence, either chased or followed Cherry out to the driveway, and after further yelling and arguing, had intentionally driven over her with his car — first forward and then backward — whereupon he turned his rage on Chilson, whom he assaulted and chased from the scene. The State produced witnesses to testify that the house was in disarray and the telephone torn from the wall. The State's key witnesses were Billy Benson and his niece, Brandi Sanders, who lived up the road and who testified that they heard yelling and arguing coming from the Spruce Lane residence, heard Glodjo rev his car engine very high, and saw Glodjo drive over something and then back over it again, though they could not see exactly what. They rushed to the Spruce Lane residence and saw Glodjo holding Cherry apologizing, but Cherry was pleading that she was in pain. They also saw Glodjo assault Chilson and pursue him in his car. After Glodjo left, they called 911 and waited for the ambulance, during which time Brandi Sanders asked Cherry who had run her over and Cherry answered, "Billy Glodjo, but I don't know why."

Glodjo testified that Cherry's death was an accident. He explained that he had been in an alcohol rehabilitation clinic in Nashville (about one hour away), and that he and Cherry had been attempting to mend their troubled relationship. She had invited him for dinner, but when he arrived she was drunk and passed out on the bed. He woke her and she left the bedroom, presumably to go to the bathroom. When she did not return, he searched the house and could not find her, so he became concerned. Assuming she had wandered off, he ran to his car and attempted to speed off to

2

find her. In his haste to turn his car around in the driveway, he ran over some hay bales that had been stacked there as a Halloween decoration, and his car started to slide down the yard. He put the car into reverse and gunned the engine to get back onto the driveway. At this point he realized that he had run over something larger than a hay bale and jumped out of the car to find that he had run over Cherry. Chilson arrived and Glodjo yelled at him to call 911, whereupon Chilson went into the Spruce Lane residence and just as quickly departed. When Chilson returned, Glodjo surmised that Chilson had gotten Cherry drunk and confronted him, eventually assaulting him and then chasing him in his car. After losing sight of the fleeing Chilson, Glodjo became despondent. He bought beer and drank it and then went to his ex-wife's house for some advice. The police found him there.

After a two day trial, the jury convicted Glodjo of the lesser included offense of first-degree manslaughter, finding that Glodjo had not intended to kill Cherry but had intended to injure her. The jury recommended 20 years in prison, but enhanced the sentence to life upon finding Glodjo a persistent felony offender (PFO). Glodjo appealed and the Kentucky Supreme Court affirmed.

On August 31, 1998, Glodjo filed a motion pursuant to Ky. R. Crim. P. 11.42, claiming — among other things — ineffective assistance of counsel because his trial attorneys, Stephen Todd and Philip Kimbel, had failed to visit the Spruce Lane residence. Glodjo insisted that the distance from Benson's front porch to the Spruce Lane residence was too far and too obstructed for Benson or Sanders to have heard arguing or to have seen Glodjo's car dart at Cherry. Glodjo submitted photographs and a map, and testified on his own behalf, arguing that had his counsel visited the site as he requested they could have obtained and produced the photographs to demonstrate the distance and obstruction, thereby discrediting Benson's and Sanders's testimony. Glodjo reasoned that by

3

thus impeaching the State's key witnesses, his counsel would have nullified the State's proof of intent and obtained an acquittal. Both attorneys testified that a visit to the Spruce Lane residence was unnecessary because they already had the information they needed to pursue an "accidental death" defense and impeach the witnesses. The trial court denied the motion and Glodjo appealed.

On appeal, the state appellate court properly identified *Strickland* as the controlling law, but grouped this claim in with others concerning the adequacy of the investigation, announcing that:

> Glodjo's trial attorneys both asserted that a more thorough investigation was unnecessary because they possessed more than enough evidence to present an accidental death defense to the jury. Glodjo failed to demonstrate at the hearing how a more thorough investigation would have aided his defense. Accordingly, we believe Glodjo failed to satisfy his burden with regard to this argument.

*Glodjo v. Kentucky*, No. 2003-CA-000858-MR, 2005 WL 326968, *2 (Ky. App., Feb. 11, 2005). Glodjo sought further appeal but the Kentucky Supreme Court denied discretionary review.

On June 15, 2005, Glodjo filed the present petition for a writ of habeas corpus, raising nine claims of constitutional error, including a claim of ineffective assistance due to his attorneys' failure to visit the Spruce Lane residence and obtain evidence to impeach Benson and Sanders. The district court denied the petition and denied Glodjo's request for a certificate of appealability (COA). Glodjo moved this court for a COA and we granted his motion as to this issue in two parts:

> (1) whether counsel's failure to visit the crime scene to investigate for evidence to impeach the testimony of the government's eye-witnesses constituted ineffective assistance and, if so, (2) whether the state court's adjudication of the claim resulted in a decision that was either 'contrary to, or involved an unreasonable application of, clearly established federal law' or 'based on an unreasonable determination of facts in light of the evidence presented.'

4

Glodjo subsequently moved this court for reconsideration, which we denied.[1]

## II.

To prevail on a claim of ineffective assistance of counsel, a petitioner must show that his counsel's deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish deficient performance, the petitioner must show his "counsel's representation fell below an objective standard of reasonableness." *Id*. at 688. To establish prejudice, he "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. A habeas petitioner is entitled to relief on an ineffective-assistance claim only if the state court's rejection of that claim was "contrary to, or involved an unreasonable application of" *Strickland*, or rested "on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Glodjo argues that the Kentucky Court of Appeals erred by concluding that he did not present any evidence to support his claim, insisting that he did submit evidence. To be sure, Glodjo submitted some evidence at the hearing and presses that same evidence here. But, be that as it may, he must still demonstrate that his counsel rendered ineffective assistance, and this he cannot do.

Because a petitioner must satisfy *both* prongs of the *Strickland* standard, the inability to prove either one of the prongs — regardless of which one — relieves the reviewing court of any duty to consider the other. *Strickland*, 466 U.S. at 697. In this case, we can begin and end our analysis with the prejudice prong. Glodjo argues that there is a reasonable probability that the outcome would

---

[1]Glodjo argues two additional issues in his appellate brief. Because we did not grant Glodjo a COA on those issues — in fact, we expressly rejected his request for a COA on those issues, twice — we decline to address them.

have been different if his counsel had visited the scene, obtained evidence (i.e., photographs or videotape) of the distance and obstruction between Benson's residence and the Spruce Lane residence, and used that evidence to impeach Benson's and Sanders's testimony. We do not agree.

It is undisputed that Benson and Sanders heard *something* from the Spruce Lane residence that caused them to rush to Cherry's aid and call 911. Glodjo asserts that they heard him yelling at Chilson to call 911, so even Glodjo does not contend that the distance was too far for them to have heard *anything*. Rather, Glodjo contends that it was too far for them to be sure that the arguing they heard had necessarily come from the Spruce Lane residence. So, assuming that defense counsel had visited the scene, obtained photographs (and perhaps even exact measurements of the distance in question), and used that evidence to challenge Benson's testimony that he had heard arguing coming from the Spruce Lane residence before Cherry was run over, that alone would not undermine the prosecution's case, nor would it even necessarily undermine Benson's testimony. Benson testified, repeatedly, that he was not good at estimating distances and conceded that he was indeed rather far away; Benson testified that his attention was drawn to the Spruce Lane residence by yelling and arguing, but that he could not make out any specifics; and Benson testified that it was too far for him to identify the people, but that he could only identify the car. For her part, Brandi Sanders testified that she did not see or hear anything until she was much closer, and was relying on Benson's account of the events that occurred while they were still at their residence. Therefore, it is far from certain that this challenge would have had the effect on Benson's testimony that Glodjo supposes.

Moreover, even assuming that defense counsel had sufficiently impeached Benson's testimony and established that he could not have heard arguing from the Spruce Lane residence, the

State had still presented sufficient evidence to obtain the manslaughter conviction. Jim Cherry, Cheryl's ex-husband, testified that he was on the telephone with Cherry when Glodjo arrived that night and that he had heard Glodjo exclaim, "I'm getting the hell out of here," just before the phone went dead. Multiple witnesses, including a state trooper, testified that the house was in disarray with the phone pulled from the wall, as though there had been an altercation. And Glodjo himself testified about his assault on Chilson and his pursuit of Chilson in his car. And, in addition to this evidence suggesting some anger and hostility, the jury was left to question why Glodjo would even have taken his car to pursue Cherry, who had apparently wandered off drunk; why Glodjo was attempting to turn his car around in a narrow and crowded driveway, rather than backing it out; why Glodjo was driving on the grass and driving over the hay bales; why Glodjo had attacked Chilson rather than protected Cherry; why Glodjo had fled the scene and not returned; and what reason Benson, Sanders, and the other witnesses would have had to testify against him, if it had indeed been an accident. Based on the evidence presented, we conclude that Glodjo's defense counsel's failure to visit the Spruce Lane residence — and resulting failure to impeach Benson's and Sanders's testimony with evidence from that scene — did not prejudice Glodjo's defense in any meaningful way.

Finally, Benson's account of the revving engine and path of the car are, for the most part, consistent with Glodjo's. Both testified that Glodjo revved the engine (albeit for different purposes) and both testified that Glodjo swung the car into the yard and back again (albeit for different purposes). We have no reason to conclude that defense counsel could have impeached this portion of Benson's testimony or that counsel could have obtained a different outcome by doing so.

Because we find that Glodjo cannot demonstrate that his counsel was constitutionally ineffective under *Strickland*, we conclude that we need not consider the second part of the COA, regarding the state appellate court's decision.

### III.

For all of the foregoing reasons, we **AFFIRM** the district court's judgment.